**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Belinda Henry, | : | Case No. 4:12 CV 2755 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **REPORT AND** |
| | | **RECOMMENDATION** |
| Defendant, | : | |

## I. INTRODUCTION

Plaintiff Belinda Henry ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of

Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying her claim

for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II

and XVI, respectively, of the Social Security Act, 42 U.S.C. §§§ 416(i), 423, and 1381 (Docket No. 1).

Pending are the parties' Briefs on the Merits (Docket Nos. 14 and 15) and Plaintiff's Reply (Docket

No. 16). For the reasons that follow, the Magistrate recommends the decision of the Commissioner be

affirmed.

1

## II. PROCEDURAL BACKGROUND

On September 18, 2008, Plaintiff filed an application for a period of DIB under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, alleging disability beginning June 10, 2008 (Docket No. 12, p. 140 of 2779). On April 2, 2009, Plaintiff filed an application for SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381, alleging disability beginning August 28, 2008 (Docket No. 12, p. 145 of 2779). Plaintiff's claim for DIB was denied initially on January 26, 2009 (Docket No. 12, p. 85 of 2779), and both applications were denied upon reconsideration on October 22, 2009 (Docket No. 12, pp. 89, 93 of 2779). Plaintiff thereafter filed a timely written request for a hearing on December 21, 2009 (Docket No. 12, p. 97 of 2779).

On November 5, 2010, Plaintiff appeared with counsel for a hearing before Administrative Law Judge Kelley Fitzgerald ("ALJ Fitzgerald") (Docket No. 12, pp. 36-77 of 2779). Also appearing at the hearing was an impartial Vocational Expert ("VE") (Docket No. 12, pp. 72-76 of 2779). ALJ Fitzgerald found Plaintiff to have a severe combination of seizure disorder, high blood pressure, low-average IQ, mood disorder, and a history of polysubstance use disorder with an onset date of June 10, 2008 (Docket No. 12, p. 23 of 2779).

Despite these limitations, ALJ Fitzgerald determined, based on all the evidence presented, that Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of her decision (Docket No. 12, p. 30 of 2779). ALJ Fitzgerald found Plaintiff had the residual functional capacity to perform medium work with the following exceptions: (1) no climbing of ladders, ropes, or scaffolds; (2) no exposure to hazards, including machinery, heights, and driving; (3) no more than occasional balancing; and (4) only unskilled work (Docket No. 12, p. 25 of 2779). The ALJ found Plaintiff unable to perform her past relevant work, but

2

able to perform other work in the national economy (Docket No. 12, pp. 29-30 of 2779). Plaintiff's request for benefits was therefore denied (Docket No. 12, p. 30 of 2779).

On November 5, 2012, Plaintiff filed a Complaint in the Northern District of Ohio, Western Division, seeking judicial review of her denial of DIB and SSI (Docket No. 1). In her pleading, Plaintiff alleged the ALJ erred: (1) in determining Plaintiff's residual functional capacity by failing to account for Plaintiff's difficulties in social functioning and concentration, persistence, and pace, as well as improperly discounting the opinions of Plaintiff's medical consultants; (2) by failing to make proper credibility findings as to Plaintiff's testimony; and (3) in finding Plaintiff could perform a range of medium work (Docket No. 14). Defendant filed its Answer on January 17, 2013 (Docket No. 11).

### III. FACTUAL BACKGROUND

**A.    THE ADMINISTRATIVE HEARING**

An administrative hearing convened on November 5, 2010, in Covington, Georgia (Docket No. 12, pp. 36-77, 103 of 2779). Plaintiff, represented by counsel Hadiyah Mayers, appeared and testified (Docket No. 12, pp. 39-72 of 2779). Also present and testifying was VE James R. Newton ("Dr. Newton") (Docket No. 12, pp. 72-76 of 2779).

**1.    PLAINTIFF'S TESTIMONY**

At the time of the hearing, Plaintiff was a fifty-one year old female who was living with her adult daughter and four grandchildren (Docket No. 12, pp. 40, 48 of 2779).[1] Plaintiff testified she graduated high school and was currently attending cosmetology school (Docket No. 12, p. 40 of 2779). She last worked in early 2008 as a warehouse packer but was terminated (Docket No. 12, pp. 42, 46 of

---

[1] Plaintiff was married at the time of the hearing but separated from her husband (Docket No. 12, p. 47 of 2779).

2779). Plaintiff previously received unemployment, but at the time of the hearing was receiving only food stamps (Docket No. 12, p. 47 of 2779). Plaintiff has a driver's license and a car and drives three times per week (Docket No. 12, pp. 48-49 of 2779). When asked what prevented her from working, Plaintiff indicated it was her seizures and mental health issues (Docket No. 12, p. 49 of 2779).

Plaintiff gave testimony concerning a number of her alleged impairments, including her seizures and mental health issues (Docket No. 12, pp. 39-72 of 2779). Plaintiff first began suffering from seizures in 1997 (Docket No. 12, p. 50 of 2779). She currently has seizures two to three times per week, both during the day and at night (Docket No. 12, pp. 62-63 of 2779). She misses approximately seven to ten days of school per month because of these episodes (Docket No. 12, pp. 63, 64 of 2779). As a result of these multiple absences, Plaintiff has twice been on probation (Docket No. 12, pp. 63-64 of 2779).

With regard to her daily activity, Plaintiff testified that she attends cosmetology school from 9:00 am until 3:30 pm, five days per week (Docket No. 12, p. 61 of 2779). Upon returning home, Plaintiff falls asleep on the living room couch and sleeps from 5:00 pm until 9:00 pm (Docket No. 12, pp. 56, 66-67 of 2779). She then wakes up, watches television, does her homework, and falls back to sleep for the night (Docket No. 12, p. 67 of 2779).

In terms of residual functional capacity, Plaintiff testified that she can dress and usually bathe herself, although her daughter sometimes has to help her in the shower (Docket No. 12, pp. 56-57 of 2779). Plaintiff can prepare cold meals for herself, such as salads and sandwiches, but does not otherwise cook (Docket No. 12, p. 57 of 2779). She does not help with household chores or shop (Docket No. 12, pp. 57-58 of 2779). Plaintiff is able to use a computer, but testified she does not do so very often, given her vision problems (Docket No. 12, pp. 58-59 of 2779). She had only been to church

4

twice in 2010 and denied any hobbies aside from hair braiding (Docket No. 12, pp. 58-59 of 2779).

Plaintiff can stand for thirty minutes at a time and sit without limitation (Docket No. 12, p. 65 of

2779). She can lift no more than ten pounds because she is afraid she will hurt herself with more

weight (Docket No. 12, p. 66 of 2779). According to Plaintiff, her ability to pay attention and focus on

things, especially in school, is limited (Docket No. 12, pp. 67-68 of 2779). Plaintiff suffers from

medication side effects, most notably drowsiness (Docket No. 12, pp. 53, 54, 66 of 2779). She has

participated in group therapy (Docket No. 12, p. 55 of 2779).

## 2.    VOCATIONAL EXPERT TESTIMONY

Having familiarized himself with Plaintiff's file and vocational background prior to the

hearing, the VE described Plaintiff's past work as a janitor as medium and unskilled, as a machine

operator as light and unskilled, and as a hairstylist as light and semi-skilled[2] (Docket No. 12, pp. 72-73

of 2779). The ALJ then posed her first hypothetical question: "[a]ssume that the claimant has the

following residual functional capacity. Medium work except with no climbing of ladders[,] ropes and

scaffolds[;] no exposure to hazards, machinery, heights or driving and is restricted to unskilled work.

Would she be able to perform any of her past relevant work?" (Docket No. 12, p. 73 of 2779). Dr.

Newton indicated that the hypothetical individual would be able to perform the machine operator and

janitor jobs (Docket No. 12, p. 73 of 2779).

ALJ Fitzgerald then posed her second hypothetical question:

Now I'm going to ask you to assume a hypothetical individual age 49 to 51 with a high
school education and the same residual functional capacity that I just described and [the]
individual has the previous work background that is the same as the claimants. Would there

---

[2] According to the Dictionary of Occupational Titles ("DOT"), hairstylist is occupationally
skilled; however, Dr. Newton testified that, *as performed*, Plaintiff's job was semi-skilled (Docket No. 12,
p. 72 of 2779).

be any jobs in the regional or national economy that she could perform . . . Medium work
with no climbing of ladders, ropes and scaffolds. No exposure to hazards . . . And restricted
to unskilled work.

(Docket No. 12, pp. 73-74 of 2779). The VE stated there was other work the hypothetical individual

could do, including: (1) hospital cleaner, listed under DOT 323.687-010, for which there are 150,000

positions nationally and 1,500 locally; (2) dietary aid, listed under DOT 319.677-014, for which there

are 186,000 positions nationally and 2,400 locally; and (3) cook helper, listed under DOT 318.687-

010, for which there are 100,000 positions nationally and 6,000 locally (Docket No. 12, p. 74 of 2779).

For her final hypothetical, ALJ Fitzgerald asked the VE to consider the "same limitations as I

just described but also the person is precluded from more than occasional balancing. Would that

impact the availability of any of those jobs?" (Docket No. 12, p. 74 of 2779). The VE responded in the

negative (Docket No. 12, p. 75 of 2779).

During cross-examination, counsel posed her own hypothetical question: "[a]ssuming the

judges first hypothetical, at medium level[,] no hazards or driving and unskilled work. Assuming

further that a hypothetical individual would each month miss approximately seven days of work due to

side effects of seizures and complications of seizures. Could this hypothetical individual do the

claimants past work?" (Docket No. 12, p. 74 of 2779). The VE stated that this number of absences

would not be commiserate with competitive employment (Docket No. 12, p. 75 of 2779).

**B.    MEDICAL RECORDS**

Plaintiff suffered a stroke in 1997, the after-effects of which included a seizure disorder

(Docket No. 12, p. 703 of 2779).[3] Plaintiff had very few seizures until April 2000, when she presented

---

[3] Plaintiff admitted to using cocaine prior to this stroke (Docket No. 12, pp. 703, 732, 1739 of
2779).

6

to the Piedmont Hospital Emergency Room ("Piedmont ER") complaining of numbness in her right side and seizures (Docket No. 12, p. 703 of 2779). Plaintiff was admitted to Piedmont Hospital's Intensive Care Unit on April 9, 2000 (Docket No. 12, p. 703 of 2779). An MRI showed Plaintiff had a large left frontal hematoma, but no evidence of a tumor or vascular abnormality (Docket No. 12, pp. 703, 1774 of 2779). A CT scan was positive for a left frontal-lobe hemorrhage (Docket No. 12, p. 1879 of 2779). Plaintiff was diagnosed with an intracerebral hemorrhage[4], hypertension, seizure disorder, and cocaine use (Docket No. 12, p. 824 of 2779).  She was discharged to the Piedmont Hospital Center for Rehab Medicine ("Piedmont Rehab") for inpatient rehabilitation on April 13, 2000 (Docket No. 12, p. 703 of 2779).

Plaintiff spent the next four weeks in rehab and had no seizures during that time (Docket No. 12, p. 1879 of 2779). She progressed well: her strength and mobility returned and she ambulated well with the use of a cane (Docket No. 12, p. 1879 of 2779). Plaintiff was discharged from Piedmont Rehab on May 10, 2000, with instructions to continue with outpatient rehabilitation, which included occupational and physical therapy as well as speech-language pathology (Docket No. 12, p. 1879 of 2779).

Plaintiff began outpatient therapy at Shepherd Pathways ("Pathways") (Docket No. 12, p. 350 of 2779). While living at home with her husband, Plaintiff participated in daily comprehensive care, including occupational therapy for activities of daily living and safety, and speech therapy for cognitive and oral motor skills, communication, and memory dysfunction (Docket No. 12, pp. 348,

---

[4] Bleeding within or around the brain, usually as a result of a rupture of a blood vessel. Also known as a stroke. ATTORNEYS' DICTIONARY OF MEDICINE, C-22540 (2009).

350, 352 of 2779). On May 22, 2000, Plaintiff underwent a Berg Balance Test[5] (Docket No. 12, p. 379

of 2779). Plaintiff was able to: (1) stand without using her hands and stabilize independently; (2) stand

safely for two minutes; (3) sit safely and securely for two minutes with minimal use of her hands; (4)

transfer position with minor use of her hands; (5) stand for ten seconds with her eyes closed; (6) place

feet together and stand for one minute; (7) reach forward ten inches; (8) pick up objects; (9) look

behind from both sides; (10) turn 360 degrees in four seconds or less; (11) complete eight steps in

twenty seconds; (12) lift her leg and hold it for three seconds; and (13) stand unsupported on one foot

for fifteen seconds (Docket No. 12, pp. 380-82 of 2779). Out of a possible best score of fifty-six,

Plaintiff scored a fifty-one (Docket No. 12, p. 379 of 2779). On this same date, Plaintiff was able to

tolerate twenty to twenty-five minutes of mild aerobic activity (Docket No. 12, p. 361 of 2779) and

some tandem forward/backward walking (Docket No. 12, p. 363 of 2779).

By May 30, 2000, Plaintiff was able to: (1) ambulate over mildly uneven terrain and negotiate

curbs, ramps, thresholds, and stairs without a device or supervision; (2) maintain balance with

moderate pertubations; (3) put one foot in front of the other; (4) walk a narrow base with no support or

loss of balance; (5) perform ten minutes of mild aerobic activity; and (6) understand and track

conversations and follow simple commands (Docket No. 12, pp. 411-12 of 2779). Her lower extremity

coordination speed was still moderately decreased and she required some assistance around the house

(Docket No. 12, pp. 411-12 of 2779). Pathways staff noted that a return to work, with

accommodations, was a reasonable goal (Docket No. 12, p. 414 of 2779). Plaintiff was discharged

from Pathways on June 16, 2000 (Docket No. 12, p. 383 of 2779).

---

[5] A physical performance evaluation of fourteen activities including sit-to-stand, reaching, turning, and single leg stance. The activities are rated on a zero to four scale. This test has been shown to be highly predictive of patient falls. Scores of less than thirty-six equal a 100% fall risk. Scores less than or equal to forty-six equal a 78% fall risk. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

On October 7, 2000, Plaintiff presented to the Piedmont ER complaining of right-sided focal seizures (Docket No. 12, pp. 1481, 2539 of 2779). She reported having "twitches" over the past two months, approximately ten episodes per day, each lasting forty-five seconds (Docket No. 12, pp. 1486, 2544 of 2779). Plaintiff remained coherent and conversant throughout these episodes (Docket No. 12, pp. 1516, 2539, 2546, 2574 of 2779). She was in the process of being discharged from the ER when she was found lying on the floor having a tonic-clonic seizure[6] (Docket No. 12, pp. 1488, 2546 of 2779). An electroencephalogram ("EEG") confirmed left frontal temporal epileptic activity, although a CT scan was unremarkable (Docket No. 12, pp. 1481, 2539, 2545 of 2779). Plaintiff was given phenobarbital and admitted to the hospital (Docket No. 12, pp. 1481, 1482, 2539 of 2779). She was diagnosed with a petit mal seizure[7] (Docket No. 12, pp. 2545, 2546 of 2779). By October 16, 2000, Plaintiff was able to walk with a four-prong cane and arrangements were made for outpatient physical therapy (Docket No. 12, p. 1482 of 2779).

On January 10, 2001, Plaintiff saw Dr. Christopher S. Russell, MD ("Dr. Russell") (Docket No. 12, p. 456 of 2779). Dr. Russell noted Plaintiff had not suffered any further strokes or seizures after her hospital stay (Docket No. 12, p. 456 of 2779). The paralysis in her right leg had improved, but Plaintiff still occasionally dragged her toes (Docket No. 12, p. 456 of 2779). Plaintiff's strength, sensation, and gait were normal (Docket No. 12, p. 456 of 2779). Plaintiff returned to Dr. Russell on April 9, 2001 (Docket No. 12, p. 455 of 2779). Dr. Russell reduced Plaintiff's phenobarbital dosage, but noted that Plaintiff was having more difficulty with her speech, which he attributed to stress (Docket No. 12, p.

---

[6] A seizure or convulsion marked by tonic and/or clonic muscular contractions. ATTORNEYS' DICTIONARY OF MEDICINE, T-116625.

[7] A mild seizure or fit, marked by a short lapse of consciousness and dizziness, but without convulsions. ATTORNEYS' DICTIONARY OF MEDICINE, P-90271.

9

455 of 2779). Plaintiff's strength, sensation, and gait were normal (Docket No. 12, p. 455 of 2779).

Plaintiff was transported, via ambulance, to the Piedmont ER on May 27, 2001, complaining of right arm and leg shaking (Docket No. 12, pp. 1545, 2603 of 2779). Plaintiff claimed to be compliant with her medications (Docket No. 12, pp. 1545, 2603 of 2779) and drug-free (Docket No. 12, pp. 450, 2621 of 2779). Both an MRI and a CT scan did not show any acute changes or new infarction (Docket No. 12, pp. 1563, 2621, 2663 of 2779). Plaintiff was admitted to the hospital and diagnosed with intractable left focal seizures with status epilepticus (Docket No. 12, pp. 450, 452, 2621 of 2779). Her seizures were controlled by June 1, 2001, and she was discharged (Docket No. 12, pp. 450, 2621 of 2779).

Plaintiff returned to Dr. Russell on July 12, 2001 (Docket No. 12, p. 454 of 2779). She complained of some episodes of stuttering speech, which Dr. Russell attributed to anxiety (Docket No. 12, p. 454 of 2779). Plaintiff was alert and well-oriented, her eye movements were full, and her gait was normal (Docket No. 12, p. 454 of 2779).

Plaintiff's records then jump to August 26, 2008, when she reported to the Rockdale Medical Center Emergency Room ("Rockdale ER") complaining of seizures (Docket No. 12, p. 262 of 2779). She stated her last seizure was in 2001, but admitted to recent medication non-compliance (Docket No. 12, p. 262 of 2779). Plaintiff was admitted for stabilization and an MRI (Docket No. 12, p. 263 of 2779). The scan showed some abnormalities which required close monitoring (Docket No. 12, p. 265-66 of 2779).

On November 1, 2009, Plaintiff arrived, via ambulance, to the Newton Medical Center Emergency Room ("Newton ER") after having a seizure (Docket No. 12, pp. 480-81 of 2779). Plaintiff was unresponsive and her daughter indicated Plaintiff had not taken her seizure medication in a few

10

days due to a recent roadtrip (Docket No. 12, pp. 497, 500, 507, 608 of 2779). A November 2, 2009,

EEG indicated a burst suppression pattern, which improved by November 5, 2009 (Docket No. 12, pp.

504, 506 of 2779). Plaintiff was diagnosed with breakthrough seizures and probable acute renal failure

(Docket No. 12, pp. 507, 513 of 2779). Plaintiff was discharged on November 16, 2009 (Docket No.

12, p. 570 of 2779).

Plaintiff returned to the Newton ER on her own on November 23, 2009, complaining of

seizures (Docket No. 12, p. 574 of 2779). She was awake but her hands were shaking and she was

stuttering (Docket No. 12, p. 572 of 2779). Plaintiff reported having fifty similar episodes that day

(Docket No. 12, p. 574 of 2779). She was discharged in satisfactory condition (Docket No. 12, p. 581

of 2779).

On January 19, 2010, Plaintiff saw Dr. Karuna Shah, DO ("Dr. Shah") (Docket No. 12, p. 1726

of 2779). Plaintiff admitted to not filling her prescriptions for seizure medications Depakote and

Keppra due to financial concerns (Docket No. 12, p. 1726 of 2779). Her cognitive function was intact

(Docket No. 12, p. 1727 of 2779). Plaintiff was diagnosed with complex partial seizures with

secondary generalization in combination with likely psychogenic seizures (Docket No. 12, p. 1728 of

2779). Plaintiff returned to Dr. Shah on February 15, 2010 (Docket No. 12, p. 1724 of 2779). Plaintiff

reported having episodes of confusion and possible seizures (Docket No. 12, p. 1724 of 2779). She

also stated she was depressed (Docket No. 12, p. 1724 of 2779). Plaintiff was prescribed Zoloft,

Keppra, phenobarbital, and Trazodone (Docket No. 12, pp. 1724-25 of 2779).

On May 17, 2010, Plaintiff again returned to Dr. Shah (Docket No. 12, p. 1722 of 2779).

Plaintiff reported her seizures had improved tremendously given her new medication routine (Docket

No. 12, p. 1722 of 2779). Plaintiff was in cosmetology school and doing well (Docket No. 12, p. 1722

11

of 2779). She attributed any breakthrough seizures to stress (Docket No. 12, p. 1722 of 2779). Her

cognitive function was intact (Docket No. 12, p. 1722 of 2779).

## C.    EVALUATIONS

### 1.    PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENTS

On October 24, 2008, Plaintiff underwent a Physical Residual Functional Capacity Assessment

with state examiner Dr. Arthur Schiff, MD ("Dr. Schiff") (Docket No. 12, pp. 295-302 of 2779). Dr.

Schiff found Plaintiff could: (1) occasionally lift and/or carry fifty pounds; (2) frequently lift and/or

carry twenty-five pounds; (3) stand and/or walk for a total of six hours during an eight-hour workday;

(4) sit for a total of six hours during an eight-hour workday; and (5) engage in unlimited pushing and

pulling (Docket No. 12, p. 296 of 2779). Plaintiff had no postural, manipulative, visual,

communicative, or environmental limitations (Docket No. 12, pp. 297-99 of 2779).

Plaintiff underwent a second Physical Residual Functional Capacity Assessment with state

examiner Dr. Russell Wallace, MD ("Dr. Wallace") on October 20, 2009 (Docket No. 12, pp. 322-29

of 2779). Dr. Wallace found Plaintiff could: (1) occasionally lift and/or carry fifty pounds; (2)

frequently lift and/or carry fifty pounds; (3) stand and/or walk for a total of six hours during an eight-

hour workday; (4) sit for a total of six hours during an eight-hour workday; and (5) engage in

unlimited pushing and pulling (Docket No. 12, p. 323 of 2779). Plaintiff could never climb ladders,

ropes, or scaffolds, but had no additional manipulative, visual, communicative, or environmental

limitations (Docket No. 12, pp. 324-26 of 2779).

### 2.    PSYCHOLOGICAL EXAMINATION

In connection with her Social Security claim applications, Plaintiff was sent for a psychological

evaluation with Dr. James Russell, Psy.D ("Dr. Russell") on November 8, 2008 (Docket No. 12, pp.

279-86 of 2779). Plaintiff was on time for the appointment and accompanied by her adult daughter (Docket No. 12, p. 279 of 2779). Plaintiff stated she had experienced numerous psychological symptoms over the years, including "panic attacks, anxiety, depression, loss of appetite, suicidal thoughts, [and] insomnia" (Docket No. 12, p. 280 of 279). Plaintiff also admitted to using various types of illegal substances, the last time being summer 2008 (Docket No. 12, p. 281 of 2779).

When asked about her current daily activities, Plaintiff stated she usually stays in bed and watches television all day (Docket No. 12, p. 282 of 2779). She is able to use the microwave, but not the stove (Docket No. 12, p. 282 of 2779). Plaintiff claimed to be unable to keep her balance "long enough to cook or clean," although admitted to being able to do the laundry (Docket No. 12, p. 282 of 2779). Plaintiff required assistance when bathing or showing to ensure she did not fall (Docket No. 12, p. 282 of 2779). She had memory problems and frequently walked away from tasks she found too difficult (Docket No. 12, p. 282 of 2779). Plaintiff reported having no friends and described her primary hobby as being on the computer (Docket No. 12, p. 282 of 2779). Plaintiff's daughter confirmed most of this account (Docket No. 12, p. 282 of 2779).

Plaintiff was cooperative and pleasant throughout the evaluation, but Dr. Russell noted she tended to be dramatic and tearful at times (Docket No. 12, p. 283 of 2779). Her affect was liable, and she denied any hallucinations or delusional ideation (Docket No. 12, p. 283 of 2779). Plaintiff was oriented to person, place, time, and situation but demonstrated mild problems in the areas of attention and concentration (Docket No. 12, p. 283 of 2779). She had difficulty with short-term memory, but her immediate recall and long-term memory were intact (Docket No. 12, p. 283 of 2779). Plaintiff had a tendency to give up easily (Docket No. 12, p. 283 of 2779).

Dr. Russell administered a variety of psychological tests, including a Rey 15-item Test, Miller

13

Forensic Assessment of Symptoms Test ("M-FAST"), and a Wechsler Adult Intelligence Scale

("WAIS-III") test (Docket No. 12, pp. 283-84 of 2779). Plaintiff had adequate motivation, but test

results were suggestive of malingering (Docket No. 12, pp. 283-84 of 2779). Plaintiff earned a full-

scale IQ score of seventy-two (Docket No. 12, p. 285 of 2779). Plaintiff was diagnosed with mood

disorder not otherwise specified, polysubstance abuse in partial remission, mathematics disorder, and

malingering (Docket No. 12, p. 285 of 2779). Dr. Russell noted the test results were an underestimate

of Plaintiff's actual abilities, given her reported academic and work history (Docket No. 12, p. 286 of

2779). He suggested individual counseling (Docket No. 12, p. 286 of 2779).

### 3. PHYSICAL EVALUATION

On November 17, 2008, Plaintiff underwent a physical evaluation with Dr. G.N. Kini, MD

("Dr. Kini") at the request of Disability Adjudication Services ("DAS") (Docket No. 12, pp. 289-90 of

2779). Plaintiff was alert and oriented and appeared competent (Docket No. 12, p. 289 of 2779). Dr.

Kini found Plaintiff had no residual deficits from her strokes or seizures, but found she had

uncontrolled seizures due to medication non-compliance and uncontrolled hypertension (Docket No.

12, p. 290 of 2779). Dr. Kini opined Plaintiff could work in most epileptic-friendly occupations as long

as she took her medication (Docket No. 12, p. 290 of 2779).

### 4. MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On January 20, 2009, Plaintiff underwent a Mental Residual Functional Capacity Assessment

with state examiner Dr. James Piat, Ph.D ("Dr. Piat") (Docket No. 12, pp. 317-321 of 2779). Dr. Piat

found Plaintiff to be moderately limited in several categories, including Plaintiff's ability to: (1)

understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain

attention and concentration for extended periods; (4) complete a normal workday and workweek

14

without interruptions from psychologically based symptoms and to perform at a consistent pace

without an unreasonable number and length of rest periods; (5) interact appropriately with the general

public; (6) accept instructions and respond appropriately to criticism from supervisors; and (7) set

realistic goals or make plans independently of others (Docket No. 12, pp. 317-18 of 2779).

### 5.  PSYCHIATRIC REVIEW TECHNIQUE

On the same day, Dr. Piat also completed a Psychiatric Review Technique for Plaintiff (Docket

No. 12, pp. 303-15 of 2779). Dr. Piat noted Plaintiff suffered from low-average intelligence, mood

disorder, and polysubstance dependency in partial remission (Docket No. 12, pp. 304-12 of 2779). In

assessing "Paragraph B" criteria,[8] Dr. Piat found Plaintiff to have a mild degree of limitation with

regard to her activities of daily living and moderate difficulty in maintaining social functioning as well

as concentration, persistence, and pace, with no episodes of decompensation (Docket No. 12, p. 313 of

2779). Dr. Piat did not find the presence of any "Paragraph C" criteria[9] (Docket No. 12, p. 314 of

2779).

### 6.  SEIZURE EVALUATION

On June 24, 2010, Plaintiff underwent a seizure evaluation with Dr. Shah (Docket No. 12, pp.

332-34 of 2779). Dr. Shah noted Plaintiff had impairments due to daytime seizure episodes (Docket

No. 12, p. 332 of 2779). She also noted the seizures were not occurring more than once weekly

(Docket No. 12, p. 332 of 2779). Plaintiff does not lose consciousness and there are no transient

postictal manifestations of unconventional behavior or significant interference with activity during the

---

[8] Paragraph B criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

[9] Paragraph C criteria also "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

15

day (Docket No. 12, p. 333 of 2779).

### IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are

identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920.  *Colvin v.*

*Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007).  DIB and SSI are available only for those who have a

"disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920.  "Disability" is defined as the

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42

U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same

definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI

claim.  First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time

he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th

Cir. 1990)).  Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at

730. A "severe impairment" is one which "significantly limits  . . .  physical or mental ability to do

basic work activities." *Id*. (*citing Abbott,* 905 F. 2d at 923).  At the third step, a claimant is presumed to

be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful

activity, has a severe impairment that is expected to last for at least twelve months, and the impairment

meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual

functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity

16

is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform.  *Colvin*, 475 F.3d at 730 (*citi*ng *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730 (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Fitzgerald made the following findings:

1.  Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2013.

2.  Plaintiff has not engaged in substantial gainful activity since June 10, 2008, the alleged onset date.

3. Plaintiff has the following severe impairments: seizure disorder, high blood pressure, low-average IQ, mood disorder, and history of polysubstance abuse.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.

5. Plaintiff has the residual functional capacity to perform medium work as defined in 20 CFR §§ 404.1567(c) and 416.967(c) with the following limitations: (1) no climbing of ladders, ropes, and scaffolds; (2) no exposure to hazards, including machinery, heights, and driving; (3) only unskilled work; and (4) only occasional balancing.

6. Plaintiff is unable to perform any past relevant work.

7. Plaintiff was born on March 14, 1959, and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8. Plaintiff has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because Plaintiff's past relevant work is unskilled.

10. Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

11. Plaintiff has not been under a disability, as defined in the Social Security Act, from June 10, 2008, through the date of this decision.

(Docket No. 12, pp. 20-31 of 2779). ALJ Fitzgerald denied Plaintiff's request for DIB and SSI benefits

(Docket No. 12, p. 30 of 2779).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42

U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-

33 (6th Cir. 2006). In conducting judicial review, this Court must affirm the Commissioner's

conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact

18

that are unsupported by substantial evidence. *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27

(6th Cir. 1967)). "The findings of the [Commissioner] as to any fact if supported by substantial

evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs*., 966 F.2d 1028,

1030 (6th Cir. 1992)). "The findings of the Commissioner are not subject to reversal merely because

there exists in the record substantial evidence to support a different conclusion . . . This is so because

there is a 'zone of choice' within which the Commissioner can act, without the fear of court

interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir.

2001) (citations omitted)).

## VII. DISCUSSION

### A. PLAINTIFF'S ALLEGATIONS

In her Brief on the Merits, Plaintiff alleges the ALJ erred : (1) in determining her residual

functional capacity by failing to account for Plaintiff's moderate difficulties in social functioning,

concentration, persistence, and pace; (2) in determining Plaintiff's residual functional capacity by

improperly discounting the opinions of medical consultants Drs. Piat and Gennett regarding Plaintiff's

limited ability to work with the general public; (3) by failing to make a proper determination as to

Plaintiff's credibility; and (4) by determining Plaintiff could perform a range of medium work (Docket

No. 14).

### B. DEFENDANT'S RESPONSE

Defendant contends the ALJ properly accounted for Plaintiff's established mental limitations

by limiting Plaintiff to unskilled work (Docket No. 15, pp. 9-13 of 20). Additionally, substantial evidence supports the ALJ's finding regarding Plaintiff's credibility (Docket No. 5, pp. 13-17 of 20). Finally, Defendant maintains the ALJ correctly assessed Plaintiff's ability to do medium work based on a proper hypothetical question (Docket No. 15, pp. 17-20 of 20).

## C.   DISCUSSION

### 1.   RESIDUAL FUNCTIONAL CAPACITY

Plaintiff makes two arguments with regard to ALJ Fitzgerald's assessment of her residual functional capacity: (1) the ALJ erred by failing to account for Plaintiff's moderate difficulties with social functioning, concentration, persistence, and pace; and (2) the ALJ erred by failing to consider the opinions of medical consultants Drs. Piat and Gennett (Docket No. 14, pp. 5-10 of 15).

To properly determine a claimant's ability to work and the corresponding level at which that work may be performed, the ALJ must determine the claimant's residual functional capacity. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). According to Social Security Regulations, residual functional capacity is designed to describe the claimant's physical and mental work abilities. *Id*. Residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). Residual functional capacity "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).

To determine a claimant's residual functional capacity, the Commissioner will make an assessment based on all relevant medical and other evidence. 20 C.F.R. § 20.1545(a)(3). Before making a final determination a claimant is not disabled, the Commissioner bears the responsibility of developing the claimant's complete medical history. 20 C.F.R. § 20.1545(a)(3). The Commissioner "will consider any statements about what [a claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. [The Commissioner] will also consider descriptions and observations of [a claimant's] limitations from [his] impairment(s), including limitations that result from [his] symptoms, such as pain, provided by [claimant], [his] family, neighbors, friends, or other persons." 20 C.F.R. § 20.1545(a)(3). Responsibility for deciding residual functional capacity rests with the ALJ when cases are decided at an administrative hearing. *Webb*, 368 F.3d at 633.

### a. MODERATE DIFFICULTIES

ALJ Fitzgerald acknowledged Plaintiff's low-average IQ and mood disorder in her findings, as well as Plaintiff's mild/moderate social functioning difficulties and moderate difficulties with concentration, persistence, and pace (Docket No. 12, pp. 23, 24 of 2779). The ALJ also acknowledged Plaintiff was found able to perform simple tasks but is "not a candidate for work with [the] general public because she is apt to respond poorly to criticism" (Docket No. 12, p. 28 of 2779). Given these limitations, ALJ Fitzgerald limited Plaintiff to unskilled work (Docket No. 12, p. 25 of 2779). Although the ALJ does not provide any additional mental health limitations on Plaintiff's residual functional capacity, her reasons for not doing so are clear and appropriate. Plaintiff is able to follow written and spoken instructions well (Docket No. 12, p. 25 of 2779). Plaintiff has been a full-time cosmetology student since March 2010 (Docket No. 12, pp. 26, 40-41 of 2779), and, as such, is

responsible for "setting up her work station, washing, shampooing and styling both mannequins and live persons" (Docket No. 12, p. 26 of 2779). She goes to school five days per week for six and a half hours a day with a one hour lunch break and two fifteen minute breaks (Docket No. 12, pp. 26, 60-61 of 2779). Plaintiff also indicated she is taking a computer course (Docket No. 12, p. 27 of 2779). Plaintiff herself indicated that despite her problems with comprehension and concentration, "she has received good grades and is currently passing all of her courses" (Docket No. 12, pp. 27, 60 of 2779).

Furthermore, ALJ Fitzgerald noted that Plaintiff has *willingly* chosen to pursue a vocation that requires continuous interaction with the general public (Docket No. 12, pp. 27, 28 of 2779). Plaintiff has stopped mental health treatment on her own, despite the recommendation of her treating physician, claiming the classes did not help and she "just wanted to keep it to herself" (Docket No. 12, pp. 27-28, 55 of 2779). The ALJ also took into account a report from one of Plaintiff's teachers, which did not identify any limitations with Plaintiff's ability to interact with others (Docket No. 12, pp. 28, 240 of 2779).

Based on the evidence and Plaintiff's testimony, ALJ Fitzgerald properly took into account Plaintiff's mental health difficulties by limiting her to unskilled work. As such, Plaintiff's first assignment of error is without merit and the Magistrate recommends the decision of the Commissioner be affirmed.

   **b.    STATE EXAMINER OPINIONS**

Plaintiff also argues the ALJ failed to properly assess her residual functional capacity by discounting the opinions of state examiners Drs. Piat and Gennett (Docket No. 14, pp. 8-10 of 15). Social Security regulations set forth specific guidelines for evaluating both medical and opinion evidence. With regard to opinion evidence, the regulations "explain the significance given to medical

opinions from treating sources on the nature and severity of an individual's impairment(s)." 1996 SSR

LEXIS 2, *2-3 (July 2, 1996). Medical opinions are "statements from physicians and psychologists or

other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's]

impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite the

impairment(s), and [his] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

The Social Security Administration recognizes that the opinions of a claimant's treating physician(s)

bear special significance and are sometimes entitled to controlling weight. 1996 SSR LEXIS 2 at *4.

When discussing medical opinions, it is important to note that not all issues regarding the nature and

severity of a claimant's alleged disability are *medical* issues, even those issued by a treating physician.

*Id*. at *5. The Social Security Administration has reserved judgment on the following items to the

Commissioner, labeling them as "administrative findings:" (1) whether a claimant's impairment(s)

meet or are medically equivalent in severity to the requirements of the Listings; (2) a determination of

a claimant's residual functional capacity; (3) whether the claimant's residual functional capacity

prevents him from doing his past relevant work; (4) how the vocational factors of age, education, and

work experience apply; and (5) whether a claimant is "disabled" as defined under the Social Security

regulations. *Id*.

   That being said, opinions from *all* medical sources, even those on issues expressly reserved to

the Commissioner, cannot be ignored. 1996 SSR LEXIS 2 at *6. "The adjudicator is required to

evaluate all evidence in the case record that may have a bearing on the determination or decision of

disability, including opinions from medical sources about issues reserved to the Commissioner." *Id*;

*see also* 20 C.F.R. §§ 404.1527(b), 416.927(b). More specific to the situation at hand, "because state

agency consultants are experts in the Social Security Disability programs, the rules set forth in 20

23

C.F.R. §§ 404.1527(f) and 416.927(f) require an ALJ to consider the consultants' findings of fact

about the nature and severity of a claimant's impairment(s) as opinions of non-examining physicians."

1996 SSR LEXIS 3, *4-5 (July 2, 1996). Thus, an ALJ is "not bound by findings made by State agency

or other program physicians . . ., but [he] may not ignore these opinions and must explain the weight

given to the opinions in their decision." *Id*. at *5. These opinions can be given weight, however, "only

insofar as they are supported by evidence in the case record." *Id*. at *6.

Here, Dr. Piat found Plaintiff to be moderately limited in her ability to: (1) understand and

remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and

concentration for extended periods; (4) complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace without an

unreasonable number and length of rest periods; (5) interact appropriately with the general public; (6)

accept instructions and respond appropriately to criticism from supervisors; and (7) set realistic goals

or make plans independently of others (Docket No. 12, pp. 317-18 of 2779). Dr. Gennett affirmed Dr.

Piat's opinion (Docket No. 12, p. 321 of 2779). Although there may be sufficient evidence to

"corroborate" the opinions of Drs. Piat and Gennett, as Plaintiff argues (Docket No. 14, p. 9 of 15),

there is *also* sufficient evidence in the record to indicate the contrary, as the ALJ suggests.

Despite finding Plaintiff had some difficulty with more detailed instructions, Dr. Piat also

found Plaintiff had no substantial difficulty in this category (Docket No. 12, p. 320 of 2779). The same

is true for Plaintiff's concentration, persistence, and pace and ability to engage in social interaction

(Docket No. 12, p. 320 of 2779). As noted by ALJ Fitzgerald, Plaintiff willingly chose to go into a

profession that requires an intense amount of social interaction (Docket No. 12, pp. 27, 28 of 2779).

Furthermore, Plaintiff herself admitted she was doing well in school *despite* her limitations with

24

concentration, persistence, and pace (Docket No. 12, pp. 27, 60 of 2779). Plaintiff's second assignment of error is without merit and the Magistrate recommends the opinion of the Commissioner be affirmed.

### 2.    PLAINTIFF'S CREDIBILITY

Plaintiff next alleges the ALJ erroneously discredited her subjective statements and allegations (Docket No. 14, pp. 10-13 of 15). Under Social Security regulations, a claimant's subjective complaints of pain or other symptoms are not, on their own, conclusive evidence of a disability. 42 U.S.C. § 423(d)(5)(A). However, a claimant may experience pain severe enough to restrict his ability to work. In such cases, an ALJ must evaluate the credibility of a claimant's allegations. Social Security Ruling 96-7p provides the framework under which an ALJ must analyze a claimant's credibility. The Ruling states, in part:

> In determining the credibility of a claimant's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

> It is not sufficient for the adjudicator to make a single, conclusory statement that the individual's allegations have been considered or that the allegations are (or are not) credible. It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

1996 SSR LEXIS 4, *2-4 (July 2, 1996). The ALJ's findings as to a claimant's credibility are entitled to deference. *Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 736 (N.D. Ohio, 2005). Here, ALJ Fitzgerald found Plaintiff's subjective statements not credible to the extent they were inconsistent with

her residual functional capacity assessment (Docket No. 12, p. 27 of 2779). A review of Plaintiff's

medical records supports this conclusion.

Plaintiff first alleges the ALJ failed to consider Plaintiff's reported sleeping difficulty, tendency

to isolate, and medication side effects (Docket No. 14, p. 11 of 15). ALJ Fitzgerald did acknowledge

Plaintiff's alleged medication side effects, but found them incredible (Docket No. 12, p. 27 of 2779).

Plaintiff alleges she is afraid to sleep, given her seizures (Docket No. 12, p. 187 of 2779), but during

her testimony, Plaintiff stated she falls asleep around 9:00 pm and "sleeps until 6:00" the next morning

(Docket No. 12, p. 67 of 2779). ALJ Fitzgerald addressed Plaintiff's alleged tendency to isolate at

great length: Plaintiff "has continued to engage in ordinary activities of daily living, she attends a full-

time vocational program, and she has willingly chosen to pursue a vocation [which] requires ongoing

interaction with the general public" (Docket No. 12, p. 27 of 2779).

Plaintiff next alleges the ALJ improperly discounted her credibility because Plaintiff had "an

unexplained gap in medical treatment from August 2008 through November 2009" (Docket No. 12, p.

27 of 2779). Social Security Ruling 96-7p specifically cautions against finding a claimant's inability to

afford treatment a basis for discrediting that claimant's credibility:

> . . . the adjudicator must not draw any inferences about an individual's symptoms and their
> functional effects from a failure to seek or pursue regular medical treatment without first
> considering any explanations that the individual may provide, or other information in the
> case record, that may explain infrequent or irregular medical visits or failure to seek
> medical treatment.

1996 SSR LEXIS 4 at *22. When asked about the gap in medical records between August 2008 and

November 2009, Plaintiff explained she could not afford treatment during that time, given her

unemployment status (Docket No. 12, pp. 69-70 of 2779). While ALJ Fitzgerald takes this gap in

treatment into consideration, it certainly is not the sole reason for discounting Plaintiff's credibility and

26

therefore was not error on the part of the ALJ.

Third, Plaintiff claims the ALJ failed to show how Plaintiff's cosmetology schooling, approximately five hours per day, translates into Plaintiff's ability to work on a regular and continuing basis (Docket No. 14, pp. 11-12 of 15). While Plaintiff's schooling is not the equivalent of a full-time job, it is evidence of Plaintiff's mental and physical capabilities. Furthermore, Plaintiff has a driver's license and drives three times per week (Docket No. 12, pp. 48-49 of 2779), even completing a twelve-hour roadtrip (Docket No. 12, p. 608 of 2779). Plaintiff prepares cold meals on her own (Docket No. 12, pp. 57, 188 of 2779). Plaintiff shops (Docket No. 12, p. 189 of 2779), does the dishes once per week (Docket No. 12, p. 188 of 2779), and does the laundry (Docket No. 12, p. 282 of 2779).

Both state examiners Drs. Schiff and Wallace found Plaintiff capable of at least medium-level work (Docket No. 12, pp. 296-99, 323-26 of 2779). Dr. Kini opined Plaintiff was capable of working in epileptic-friendly environments (Docket No. 12, p. 290 of 2779). Although Plaintiff takes issue with the ALJ's conclusion that "no treating sources have precluded [Plaintiff] from working," as an issue specifically reserved for the Commissioner, the ALJ is still entitled to take these findings into consideration. Under the Social Security regulations, an ALJ is required to consider "all of the evidence presented." 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Just because ALJ Fitzgerald seemingly reached the same conclusion as Plaintiff's physicians does not mean she accepted, absent any further analysis, the conclusions of these physicians. In fact, the ALJ's decision shows that she considered, in great detail, the balance of the objective medical record as well as Plaintiff's subjective statements in rendering her ultimate conclusion (Docket No. 12, pp. 20-31 of 2779).

Finally, Plaintiff alleges the ALJ used improper language in stating, "the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible

27

to the extent they are inconsistent with the above residual functional capacity assessment" (Docket No. 12, p. 27 of 2779). This allegation is unfounded. As stated above, an ALJ must do more than "make a single, conclusory statement that the individual's allegations have been considered or that the allegations are (or are not) credible." 1996 SSR LEXIS 4 at *3. This determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. *Id*. at *3-4. Here, ALJ Fitzgerald did much more than simply state Plaintiff's testimony and subjective statements were incredible. The ALJ provided a lengthy, detailed analysis of her reasoning for discrediting Plaintiff's allegations.

Therefore, Plaintiff's third assignment of error is without merit and the Magistrate recommends the decision of the Commissioner be affirmed.

### 4.  HYPOTHETICAL QUESTION

Finally, Plaintiff alleges the ALJ erred in determining Plaintiff could perform medium work because the ALJ based this determination on an incomplete and improper hypothetical question (Docket No. 14, p. 13 of 15). Specifically, Plaintiff alleges the ALJ's hypothetical question did not reflect any limitations regarding Plaintiff's moderate difficulties in social functioning, concentration, persistence, or pace (Docket No. 14, p. 13 of 15). Furthermore, the question did not reflect the opinion of either Dr. Piat or Dr. Gennett with regards to Plaintiff's limited ability to interact with the general public (Docket No. 14, p. 13 of 15).

In the Sixth Circuit, in order to be considered substantial evidence, a VE's testimony must be based on a hypothetical question which accurately portrays the claimant's physical and mental

impairments. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). However, it is also "well established that an ALJ . . . is required to incorporate only those limitations accepted as credible by the finder of fact" into the hypothetical question. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

Here, ALJ Fitzgerald's hypothetical questions included a number of limitations, including a limitation to medium work, no climbing of ladders, ropes or scaffolds, no exposure to hazards, machinery, heights, or driving, a restriction to unskilled work, and no more than occasional balancing (Docket No. 12, pp. 73-75 of 2779). As noted early in this discussion, ALJ Fitzgerald properly took into account Plaintiff's mental health difficulties by limiting her to unskilled work (Docket No. 12, p. 25 of 2779). The same is true of the opinions of Drs. Piat and Gennett. Although both state examiners found Plaintiff to have moderate limitations with regard to social interaction, concentration, persistence, and pace (Docket No. 12, pp. 317-20 of 2779), these limitations are contradicted by Plaintiff's daily activities and decision to go into a profession that requires an intense amount of social interaction (Docket No. 12, pp. 27, 28 of 2779). Plaintiff herself admitted she was doing well in school *despite* her limitations with concentration, persistence, and pace (Docket No. 12, pp. 27, 60 of 2779). These limitations are also minimized by the doctors themselves. Despite Plaintiff's difficulty with concentration, persistence, pace, and social interaction, neither Dr. Piat or Dr. Gennett found these difficulties to constitute a substantial limitation (Docket No. 12, pp. 320, 321 of 2779). It is well established that an ALJ "is required to incorporate only those limitations accepted as credible by the finder of fact" into the hypothetical question. *Casey*, 987 F.2d at 1235.

Plaintiff's allegation that the ALJ failed to provide Plaintiff an opportunity to question or cross-examine the VE is completely without merit. The administrative hearing transcript shows Plaintiff's

29

counsel herself posed a hypothetical question to the VE (Docket No. 12, p. 75 of 2779). Therefore, Plaintiff's fourth assignment of error is without merit and the Magistrate recommends the opinion of the Commissioner be affirmed.

### VIII. CONCLUSION

For the foregoing reasons, this Magistrate recommends the decision of the Commissioner be affirmed.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:  July 12, 2013

## IX. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.

31